# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

THOMAS C. BROWN,                    )
                                    )
    Plaintiff,               )
                                    )   No. 3:08-0371
v.                                  )   JUDGE HAYNES
                                    )
CITY OF FRANKLIN and ROCKY          )
GARZAREK, individually, and in his  )
capacity as Fire Chief of the       )
Franklin Fire Department,           )
                                    )
    Defendants.              )

## M E M O R A N D U M

Plaintiff, Thomas C. Brown, filed this action under Title VII of the Civil Rights Act of

1964, as amended 42 U.S.C. § 2000e et seq. against the Defendants: City of Franklin and Rocky

Garzarek,[1] individually, and in his capacity as Fire Chief of the Franklin Fire Department.

Plaintiff asserts claims for retaliation for his protected activity in the investigation of race

discrimination complaints by African American firefighters in the City's Fire Department.

Plaintiff alleges that he assisted in filing complaints against the City and opposing the Fire

Department's discriminatory practices. Plaintiff also asserts a violation of his First Amendment

right of free speech due to adverse employment actions against him for his statements about

racial discrimination in the City's Fire Department. Plaintiff also presents claims under the

Tennessee Human Rights Act, ("THRA") Tenn. Code Ann. § 4-21-101 et seq., the Tennessee

Constitution, and common law.

Before the Court is the Defendant's motion for summary judgment (Docket Entry No. 29)

---

[1]Plaintiff subsequently dismissed his claims against Garzarek. (Docket Entry Nos. 24 and
25).

contending, in sum that Plaintiff lacks "credible evidence" to support his claims and that Plaintiff's proof fails to establish any actionable City policy or any retaliation conduct. (Docket Entry No. 29-3 at p. 10). In response, Plaintiff asserts that his proof is sufficient on his Title VII and THRA claims for retaliation and his First Amendment claim and that the Defendant Garzarek's acts and statement as the City's Chief establish the City's liability. Plaintiff has also filed a motion to supplement his response to the Defendant's motion for summary judgment (Docket Entry No. 48), and that motion should be granted.

## A. Findings of Fact[2]

On March 16, 2006, Plaintiff was promoted to Captain in the Franklin Fire Department. At some point, Gairy Ferguson, an African American firefighter told Plaintiff that he was not afforded the same training as a White firefighter. (Docket Entry No. 29-11, Brown Deposition at pp. 60-61). Although Plaintiff's actual conversation with Ferguson is not described in his deposition[3], the undisputed proof is that Ferguson complained of discrimination and harassment. (Docket Entry No. 29-15, Harmon Memorandum and Docket Entry No. 29-6, Horton Affidavit at p. 1).

Plaintiff contends that he assisted Ferguson and other African American firefighters with

_____

[2]Upon a motion for summary judgment, the factual contentions are viewed in the light most favorable to the party opposing the motion for summary judgment. Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986). As discussed infra, upon the filing of a motion for summary judgment, the opposing party must come forth with sufficient evidence to withstand a motion for directed verdict, Anderson v. Liberty Lobby, 477 U.S. 242, 247-52 (1986), particularly where there has been an opportunity for discovery. Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986). The Court concludes that based upon the applicable law, there are not any material factual disputes. Thus, this section constitutes finding of facts under Fed. R. Civ. P. 56(d).

[3] The citations to deposition pages in this Memorandum are to the numbers in the transcribed deposition, not the Clerk's electronic filing system.

2

their complaints of racial discrimination, citing his deposition testimony (Docket Entry No. 40-1, Brown Deposition at pp. 9-10), but Plaintiff's actual statement about his view and reaction to Ferguson's complaint and legal action was that "it would be a misunderstanding that I support him in any avenue he took to resolve ... did I go beat the war wagon to say go file a lawsuit, no, that would be an incorrect statement." Id. at 55-56.

According to the Defendant, instead of submitting Ferguson's complaint to his department head, Garzarek, Plaintiff spoke to Gentry Fox, his immediate supervisor in the fire department. (Docket Entry No. 40-3, Fox deposition at p. 26). According to Fox, complaints of harassment in the fire department have always been reported up the chain of command and not to human resources. Id. at pp. 25-26, 33-35. Yet, after talking to Brown about Ferguson's complaint, Fox considered Ferguson's complaint was due to "personality differences," not race. Id. at p. 27. After talking to Fox, Plaintiff investigated Ferguson's grievance and reported back to Fox who was satisfied with Plaintiff's investigation that there was not any racial discrimination or harassment. Id. Fox never reported Ferguson's complaints to Garzarek nor the City's human resources department and was reprimanded by Garzarek for failing to follow the City's rules in reporting racial harassment complaints. Id. at pp. 60-63.

On December 8, 2006, Ferguson also discussed his race discrimination concerns with Todd Horton, Garzarek's chief deputy and other officers. (Docket Entry No. 29-6 at ¶¶ 2, 3). Horton prepared a written report that resulted in an investigation by the City's human resources department. Id. On December 20, 2006, Shirley Harmon, the City's director of human resources and Randy Wetmore, her assistant interviewed Plaintiff about Ferguson's race harassment complaint. (Docket Entry No. 29-4, Harmon Affidavit at ¶ 5).

3

Defendant asserts that under the City's human resources policy, Ferguson's complaints should have been submitted first to Garzarek as the department head and then to the City's Human Resources Departing for investigation, citing Rule XVII, Section 19.3 of the Human Relations Department. That rule, as pertinent here, was set forth in a memorandum from Garzarek and provides as follows:

> **Reporting and Investigation of Harassment Complaints**-The Human Resources Director is the person designated by the municipal government to be the investigator of complaints of harassment of employees ... When an allegation of harassment is made by an employee, the person to whom the complaint is made shall immediately prepare a report of the complaint according to the preceding section and submit it to the Department Head...."

(Docket Entry No. 29-17).

In her interview of Plaintiff, Harmon was investigating Ferguson's "racial harassment" complaint. (Docket Entry No. 29-4, Harmon Declaration at ¶¶ 4, 5). Harmon was unaware that Plaintiff was also interviewed by the City's retained counsel in litigation involving the African American firefighters. Id. at ¶ 4. Plaintiff described that interview as follows:

A.    That meeting with Shirley and Randy in there - one of the things I distinctly remember is disclosing my support for Gary to have the same opportunity the other African Americans would get.

Q.    Same kind of support for Gary you had shown that you talked about earlier as -

A.    Specifically having the right to file a complaint - excuse me, work things out in the station, file an official complaint all the way up to he has all the rights if he wanted to file a lawsuit. That was something that I made clear to them. He was never denied anything in there, any opportunity to resolve his issues.

Q.    So you expressed the same sort of open-minded neutrality with regard to his potential claims as you had with the other plaintiffs?

4

A.     Yes.

Q.     Do you remember anything else that was discussed in that meeting with Shirley Harmon and Randy Wetmroe?

A.     Yes. They were doing a fact finding investigation in that meeting regarding complaints brought about by Gary Ferguson. His complaints, I believe, were stemmed from a meeting with Todd Horton, Lieutenant Yearwood, and himself in which they met. And during that meeting I believe it was brought out that he felt he had been discriminated against, which turned into internal investigation, and I was brought in for questioning regarding that.

Q.     What specifically was asked or what was discussed?

A.     They asked if conversations were held with Gary.

Q.     Between you and Gary?

A.     Yeah. Specifically, that's one of the things that I was asked, did I ever deny him the right to file a complaint. I thought it was weird the way they asked. I was asked, did I encourage him to file a lawsuit. That was specifically from Shirley, and I thought that was unique because I said, no, I didn't encourage him. But he knew I would support him in anything he needed to do to resolve his issues, whether it be work things out in -house, meaning if there is a disagreement in the station, let's talk about it, but if that wasn't acceptable to him, he had the right to follow policies and file a complaint. Of course, she brought up the lawsuit. I said, not, I didn't deny him that.

Q.     What did they mean by deny him the process? What were they asking you about?

A.     The question was more aimed toward, did you recommend him to filed a lawsuit or did you encourage him t file a lawsuit, something of that nature. I said, "No, I did not."

Q.     Was that true?

A.     Did I tell him to go file a lawsuit?

Q.     Yes.

5

A.     <u>No.</u>

Q.     So telling her that you didn't was true?

A.     Yes.

Q.     <u>If Gary Ferguson has told people that you were encouraging him or trying to get him to filed a lawsuit, would you have any explanation for that?</u>

A.     <u>Yeah, basically it would be a misunderstanding that I support him in any avenue he took to resolve his issues.  There is a difference between me making a statement saying if that's the only way you feel you can resolve the issues, then you could.  That's his right, but that would be it.  I guess if the question is basically did I beat the war wagon to say let's go file a lawsuit, no, that would be an incorrect statement.</u>

Q.     Did you tell him that you would help him prove his case?

A.     If by saying I would tell the truth about anything that I was aware of, yes. That would be it.  <u>I never - I do not remember making any statements saying I will help</u> - I guess I am trying to get the point of what you are asking for before I answer that.

Q.     Did you ever say anything like, I will help you prove your case, or I can provide information that will prove your case, or anything like that?

A.     There was one specific instance that might be referring to.  That would be writing assignment whenever I was off due to an injury.  He asked - he brought it to my attention he had to ride a certain truck.  I said I could look and see if that's a fact.  I investigated that is - I believe I shared that with Shirley - I went back and looked at, what we call, our vision records.  That shows the riding assignment as to where people were riding on - -

                                    *   *   *

A.     Yes.  I think that was specifically – he pointed out, upon me returning there, that he had asked for training on, I thin, preparing for his apparatus operator exam, and I had set aside a process in which he could get that.  It was to achieve checkoffs.  Whatever you get will go to this test.  You have to have an officer or somebody that has instructor one check you off on these disciplines to qualify to take this written test.
I put that process into place with, I believe it was, Richard Hesling.
I think I have notes on it, but I believe that was what it was.  I put

6

that into place. Then I was injured and left. Upon returning, in this conversation, he brought it to my attention they hadn't been working on that, that that hadn't been fulfilled, and also brought it to may attention about, I believe it was, Jeremiah Rogers who got it. And I told him I would check into that and see why or what's going on.

Q.  In this same conversation he told you that he was thinking about or considering joining the discrimination lawsuits or something like that?

A.  At that time I think that's what sparked me to ask him very directly. It was more of a general comment of – I am really paraphrasing, but to the best of my knowledge, he was kind of like, why wouldn't they expect somebody else to file a lawsuit and join it with the way these things are going on? It was the kind of a generalized thing.

\* \* \*

Q.  Right, but at the moment I want to keep it focused on one piece in the chronology at the time, talking about that conversation you had with Gary Ferguson before you met with Shirley Harmon and Randy Wetmore, right?

A.  Yes.

Q.  There is another part in his testimony where the question is, "But did you tell him you were thinking about joining the race discrimination lawsuit?" His answer was, "I told him the actions were causing me to want to join." Does that ring a bell? Do you remember him testifying to that?

A.  Actually, I don't remember him testifying to that in that hearing, no. But I can see him saying that if that's what is in there. I just personally don't remember it.

Q.  Let me ask a more important question that whether you remember him saying it in his testimony. Do you remember having those conversations with him where he expressed an interest, at least, in considering joining the race discrimination lawsuit?

A.  Yes.

Q.  Tell me a little bit more about the specific nuts and bolts ways he felt he was being treated differently. You mentioned not eating together. It that one thing?

7

A.  Well, what it was is he took and told me upon returning – this is after I had been injured – that there was times where the guys wouldn't ask him if he wanted to join in and he wouldn't.

Q.  Just for times purposes, you came back from your injury I the summer of 2006, right?

A.  Yea, just prior to that meeting where I spoke with him whenever I cited on there I just returned, if I am remembering correctly.

Q.  Go ahead.

A.  But that was it. And in the context of us sitting out there having a conversation, not a request of him to talk to me or bring an issue to me, we're just having a conversation, and these things come up. The direction it went into I literally asked him, do you feel you are being treated differently right now, and do you want to have it reported. And at that time he sais no.

Q.  He didn't want to?

A.  That night he said no. As a matter of fact, I believe that's the meeting in which he asked me about a transfer. I told him there is not official way to ask for a transfer to another station, but the most logical way would be to e-mail me and I will forward it to my supervisor who makes staffing decisions and we'll get you an answer if you want to do that. That may have been later, another time.

Q.  Whose station did he first want to be transferred to? Do you recall? Was it Baltimore?

A.  I think he had a desire to work for Rick Cotton.

Q.  Because he had work with Rick Cotton previously?

A.  Yeah.

Q.  When he said that to you, did he say he wanted to be transferred to Rick Cotton's station because Rick Cotton was black and he felt he would get a better chance ever being treated fairly?

A.  I don't remember that statement being made. I knew he wanted to work with Rick though. I know he would have preferred to have been assigned

8

with Rick.

Q.   Did you tell Gentry Fox that Gary Ferguson had expressed to you a desire to go work with Greg because with a black supervisor he felt he might be treated more fairly?

A.   That would be – with respect that would be putting words in for me.

Q.   Did you say anything like that?

A.   Gentry was informed of every single meeting and conversation that occurred between myself and Gary, specifically that night. He and I sat out there having a conversation that turned into a discussion, where I told him all of his options, and he specifically and blatantly very clearly said, no, I don't want to act on anything. I said, okay, because the conversation was a conversation, not someone reporting. And I got the sense that I needed to help. I needed to go through my chain of command and keep them informed and get direction. Literally, as soon as he walked away, I walked five feet trough one door and right into the other into Gentry's office and had a full conversation disclosing everything we talked about, and basically asked what I should do with that and what actions I should take. That happened on – because I was working with Gentry at that time, every daily activity we would discuss.

Q.   I understand what you are saying in general, that whatever Gary Ferguson told you, you then turned and told Gentry Fox–

A.   Yes.

Q.   – but I am asking a more specific question. Isn't it true that you told Gentry Fox that Gary Ferguson had said to be transferred to Rick Cotton's station because with a black supervisor he would have a better chance of being treated fairly?

A.   That statement I can't say yes to. I don't remember that. I remember specifically telling Gary – I think it was more of a question of he wanted to work with him, but I don't remember getting that specific reason from him, if that makes sense, that he would be treated better. I don't remember being told that specific statement at all. I remember him saying, "I would like to work with Rick Cotton," and he said it was because he worked with him before. I remember that statement but don't remember specifically what you are saying for the treatment, because I do remember telling him, well, there is not guarantee who you will work with. If you put in a

9

request for transfer, they have to consider the best thing for the city staffing and other things. I am not the one who can make that decision. If you choose to want to transfer, then just send me an e-mail and I will forward it to Gentry as a request and see if he can take and approve that. We don't have a formal process.

Q.    When his request to be transferred to Mr. Cotton's station didn't happen, did Gary Ferguson express an interest as a backup in being transferred to Mr. Baltimore's station?

A.    Not to me. I think at that time it...

(Docket Entry No. 40-1, Brown Deposition at pp. 52-56, 61-62, 63-68) (emphasis added).

Plaintiff told Harmon and Wetmore that Ferguson's problems were not race-based, but due to a personality conflict. (Docket Entry No. 29-4, Harmon Affidavit at ¶ 6).

The proof reflects that other persons were investigating Ferguson's statements about discrimination and harassment. In October 2006, the City's counsel interviewed Plaintiff and other city employees in their investigations of the pending race discrimination actions against the City's Fire Department. Id. at ¶ 4. Plaintiff described that meeting as follows:

A.    I had a meeting with those two individuals - - I believe that's who it was - - in the human resource department of the city of Franklin;

Q.    Were they asking to meet with you in order to interview you about the discrimination lawsuits that were going on?

A.    That's correct.

Q.    Tell me everything you remember being said in that meeting.

A.    It started off with general questions regarding the lawsuit and went from a few general questions with extensive answers to, "here, can you just look at this," and handed me a list of pages of information and questions regarding every one of them from - - the names I remember seeing and Greg Baltimore, Rick Cotton, Mike Jones and Darryl Jones. It was questions regarding all of them. It looked like they had derived themselves.

10

Q. They had derived themselves? What do you mean?

A. More or less, they were seeking information as to what I knew about the lawsuits, and that's what the questions were regarding. The specific instances that those individuals had claimed to have occurred in their lawsuits or the actions taken against them - they asked me about those.

\* \* \*

Q. Do you remember what the questions were that the lawyers pointed to and asked you about?

A. I know one comes to mind is regarding Rick Cotton. It asked if I had any knowledge of the incident happening, and it was a claim that he had made that he was not being given the opportunity to act in the shift commander's position. I am paraphrasing of course to the best of my knowledge. I had witnessed a time in which the current shift commander, Todd Horton, had taken and sent Rick to another station and brought a white officer, which was the same rank, to that station and put him in a position where he acted as shift commander instead; then, of course, went into details as to who that was very unusual to have happen because Rick was currently assigned to Station 2, and by him being assigned there, it was very traditional that the person who was at that station when the shift commander left they actually - it was an assumption they stepped up and took his spot.

Q. So that seemed out of the ordinary to you at the time?

A. At the times back whenever it happened.

Q. Yes.

A. I think it was a clear thing he didn't want Rick Cotton to be the shift commander, very clear.

Q. My question is: For him to have swapped them like that seemed out of the ordinary?

A. Yes, very out of the ordinary.

Q. But you don't actually know, do you, what the factors may have been that he was considering when he decided who to assign as shift commander that day?

11

A.    He did not stated his considerations to me. No, Todd Horton did not.

Q.    Do you remember anything else that you said to them about that incident in that investigation meeting?

A.    They did ask if I felt - what my opinion was regarding that and why it happened.

Q.    What did you tell them?

A.    At that time I told them that, basically knowing Rick Cotton, and the facts of what had occurred, and learning about other things that had been happening, I made it clear to him if he is claiming that is discrimination that occurred to him, then I fully believed that would be an honest statement or accusation by him.

      And they asked me why I said that, and I told them. I said, "if there is anybody with character and honesty, you can test him and you will not succeed in your test. He is an honest person."

Q.    Meaning Rick Cotton?

A.    Rick Cotton. If he has come to you and said you are discriminating, the he has went through a process to try to resolve the issue and hasn't been able to. They knew whenever I left there they were taking extreme circumstances to push him to where he would file a lawsuit to settle an issue of discrimination. They knew that when I left, if he couldn't resolve it any other way, it would take a lot to get him there, because he is an honest person in that way, in my opinion.

Q.    Do you remember anything else that you said in that meeting about the Rick Cotton incident?

A.    I am trying to think. There were some other questions they had, but without having them, I can't remember. But, yes, I disclosed - they asked other questions, and I told them. The primary people that I told them - I think there was one instance with Grey Baltimore that I answered, and then there was more than one with Rick Cotton, because I worked with Rick longer and just happened to be in a position where I witnessed some things happening like that.

      I did witness him getting moved and a white officer coming in. I answered those questions, but I can't remember the others as

12

vividly without looking at the questions. If I had those questions, I could probably tell you verbatim what I said.

Q. Do you remember anything, though without finding that document, about the other incidents involving Rick Cotton that you talked about in that meeting?

A. I believe - I am trying to remember the best I can, but I believe there were questions regarding promotional opportunities and then his reassignment whenever he returned from his wife's illness.

Q. What do you remember about those? Let me clarify, not what you remember about them generally, but what did you tell the lawyers in that meeting?

A. With regard to the promotional process, they asked me my - I am doing the best I can, but I believe they asked me questions that were open ended with regard to how did I perceive he was affected in the promotional process. I clearly told them in there that it was obvious to me that the system keeps changing, and those changes are consistent in eliminating the African Americans from being promoted; and that's extremely paraphrasing. I remember having a conversation with them.

Q. With the lawyers?

A. Yes, and telling them it's almost every single time that the promotions change. And I can see the city is growing. We grow and try to grow with it, and have the most qualified people, and the system to accommodate that to always change - I am trying to say with the professional aspects of the job. I also told them, it was just apparent to me, that the process always caused and affected a lot of people like Rick, Greg, and Mike and individuals like that that were African American. I remember stating that to them, or, actually, I think I specifically said "affected Rick." That's where I was - directed the questions.

Q. Do you remember anything else that was discussed bout Rick Cotton in that meeting?

A. I believe that we spoke about his reassignment upon coming back. H was my station officer at Station 2. He was lieutenant there. . . .

Q. What did you tell the lawyers about that?

13

A.    I believe they asked questions regarding, is that a bad thing or punishment; how do you see that" It's common knowledge reassignment to Stations 4 and 5 can be used as a punishment without stating it's a punishment, because if you are at Station 2, there are privileges and opportunities that come about that just do not present themselves at 4 and 5.

*   *   *

Q.    You are not just telling me what you saw; you are telling me what you actually said to the lawyers in the meeting?

A.    Yes. I am trying to state that those are the questions that they asked regarding promotional process, and I referred to Rick and Greg. I believe that was the only time I referred to Greg, because I didn't work with him a whole lot. It was with regards to Greg Baltimore, I believe, that my answer were strictly pertaining to the promotional process and how it would have affected him. Whenever I was speaking, the know I was speaking about Rick and Greg and sharing how the promotional process would have affected them.

Q.    Do you remember -

A.    Wait a second. I do remember I generally also stated about a promotional process that occurred in which I was involved with and I believe Greg Baltimore was too, in which we were both denied the opportunity to put in because of different reasons. I don't know his. I do know that mine was that there was a rule of how many years you had to be in a position. I think it was, at the time, three years with the city. You had to be an employee three years. They disqualified me for that and turned around and gave somebody else an opportunity to put in, waivered him, and gave him the promotion. And that was Gerald Coats whenever he went for the lieutenant position.

Q.    He hadn't been there three years?

A.    No. He didn't meet another requirement. I think it was a certification as a fire officer one. I believe I mentioned that to where I had been affected by that, and that was an example of how, even if they changed the promotional process, if it didn't quite fit or get the persons they wanted, they would find a way.

Q.    <u>But in the situation you just described, did that have anything to do with race discrimination or retaliation or anything?  Are you just trying to make</u>

14

A.     No, no. I used that as an example of how the promotional process could be skewed and how they would do that and eliminate people like Greg and Rick, because I do believe was involved in that promotional process.

Q.     You told the lawyers in the meeting about that incident?

A.     Yes, and how it affected me and I believe it affected Gregg, too. That was an example.

(Docket Entry No. 40-1, Brown Deposition at pp. 12-14, 16-22, 30-32) (emphasis added).

In addition, Plaintiff was deposed in a racial discrimination action against the City and described that testimony as follows:

Q.     So, in the deposition in the Darryl Jones lawsuit you talked about the Rick Cotton matter again.

A.     I believe there were statements in there about Rick Cotton, yes. I made general statements about being in support of things that happened to him; same similar items I have you with the questions I gave the attorneys.

Q.     It that everything you remember about the Darryl Jones lawsuit deposition?

A.     Right now, yes.

\*    \*    \*

Q.     So let's go to the next thing that you did that you think may have motivated people at the city to retaliate against you.

A.     I believe it was common knowledge that I supported everyone there who was filing discriminatory lawsuits. What I mean by that is everyone in the department knows I have a good working relationship and treat everybody fairly, even particularly, in this case, African Americans, and think that common knowledge is something that led to me being treated differently because I would take a neutral stance of always speaking out to say, "Let them say what they need to. Let them have the right to resolve this." And I would do that in general conversation, because people, as these things become public, they become water cooler conversation. Even lack of

knowing details, people would speak about the culture and changes in our environment with all these issues being brought to light.

If a conversation would come up around me, it was clearly my stance on it, and that was to support them as firefighters, as friends. I mean in conversation, always I would support them even with the management or with my supervisors.

Q.    What do you mean by support them?  You are not talking about support in the sense of saying their allegations are true?  You just described it as saying they should be allowed to speak their minds and have their say?

A.    Exactly, and not to judge them, let it run its course, if you are not involved, let it go, it will work out.

Q.    So, neutral?

A.    Yes.  Right there being neutral, especially during the beginning of all this was very, I believe, looking back and reflecting on its would be a very outspoken perception.

Q.    I don't understand the statement.  I don't understand what you mean.

A.    Whenever the lawsuits were filed, it seemed like a division.  You either agreed with them or you didn't.  To step up and go in a position where you ere neutral and say we don't know that facts, let these guys speak up, and do what they need to do.

Q.    You didn't jump in either camp, and that made you different; is that right?

A.    I guess I -

Q.    You didn't say, they did it, they are guilty; but, you also didn't say, those whatever, whatever, how dare they file a lawsuit?  You didn't jump in either - -

A.    Yes, but being someone to say they deserve that opportunity, that would have pushed me toward clear support of the African American.  At that time, the culture, it was know that I supported them.  I would take . . . .

Q.    And because you wouldn't be with them and hating the plaintiffs, they may have perceived you as against them?

16

A.     Yes, exactly.

*     *     *

Q.     <u>Are you taking neutral open-minded position with regard to the claims?</u>

A.     <u>Yeah, or making statements that as I would learn things and find out here is how they were treated as in being moved around or being - how do I say it - not being given certain opportunities. I can remember having conversation when I reflect on that and say I am starting to get the same treatment.</u>

<u>Id.</u> at pp. 37, 39-42, 46 (emphasis added).

In his deposition testimony in <u>Darryl Jones, et al v. City of Franklin</u>, Plaintiff testified, "Because whenever he [Gairy Ferguson] was an employee there, everything was resolved, and *at no time did I identify at any point as any hostile work environment or discriminatory things going on.*" (Docket Entry No. 29-21, Brown Deposition at p. 20) (emphasis added). Plaintiff also testified, "But I don't know about the hostile work environment because whenever he was with me, he identified specific incidents, but *I haven't seen or heard nothing."* <u>Id.</u> at p. 21 (emphasis added).

Q.     <u>Do you have any knowledge of any racially derogatory remarks or racial slurs being made at the fire department?</u>

A.     <u>I think that was one of them that I could affirmatively say no, because I think the general opinion, that if someone were to have that type of - more or less, if someone felt that way, they wouldn't say it around me.</u>

Q.     Do you ever recall Don Claiborne using the word wigger? (sic)

A.     No.

Q.     What about any personnel at the Franklin Fire Department using that word?

A.     No, because like I said, they wouldn't around me . . .

*     *     *

17

Q. So, if I understand your testimony, you are not aware of any racially derogatory inappropriate comments being made about African Americans or African American fire fighters?

A. No.

Q. Any you have no personal knowledge of an African American fire fighter being discriminated against in the promotion process?

A. Not specifically. Like I said, in the questioning, I want to reiterate, I was asked a general statement in which I said what has happened to me. I felt like that was a concern in the process kept changing, and no matter how much it changed, I would take and always end up on, two or the [o the certification list] and still be overlooked, and I made a general statement to that effect.

Id. at pp. 29-30, 35-36 (emphasis added).

On January 31, 2007, Garzarek issued a counseling letter to Plaintiff and extended

Plaintiff's probation for his captain promotion, citing Garzarek's perception of the Plaintiff's

weak management skills and poor judgment. (Docket Entry No. 29-3, Garzarek Affidavit at ¶ 9).

Garzarek explained that he placed Plaintiff on probation because Plaintiff "did not show the level

of judgment and discretion" necessary and because Plaintiff "rubbed people the wrong way and

alienated" them. Id. at ¶ 9.

On February 4, 2007, Harmon issued a report to Jay Johnson, her supervisor, that Brown

and Fox acted inappropriately in failing to reporting Ferguson's harassment claim. (Docket

Entry Nos. 29-15 and 29-16, February 4, 2007 Memoranda from Shirley Harmon to Jay

Johnson). Johnson approved Harmon's findings and sent Harmon's findings to Garzarek with a

separate memorandum. (Docket Entry No. 29-16). On March 26, 2007, Garzarek informed

Plaintiff and Fox of their failures to follow City policy on reporting racial harassment and

discrimination complaints. (Docket Entry No. 29-18 and 29-19, March 26, 2007 Memoranda

18

from Garzarek to Fox and Plaintiff).

On March 26, 2007, Plaintiff also received written disciplinary action for failing to report Ferguson's complaints of a racially hostile environment to the City's Human Resources or a department head instead of his chain of command regarding a report to Fox. (Docket Entry No. 40-1, Brown Deposition at pp. 105-109). In addition, Garzarek suspended Plaintiff without pay for one day on March 29, 2007. Id. at p. 108. Plaintiff cites Garzarek's statement regretting his promotion of Plaintiff and Garzarek's subsequent retraction of that statement. Id. at p. 106. Garzarek placed Plaintiff on probation thereby excluding him from any promotional certification list. Id. at p. 108.

After March, 2007, Plaintiff was transferred from Station 2 to Station 5 by Fox, his immediate supervisor. (Docket Entry No. 29-23, Plaintiff's Response to Defendant's First Set of Interrogatories, No. 3; Docket Entry No. 29-12, Brown Deposition, at pp. 117-125). Fox testified that it was "totally my decision to transfer" Plaintiff without any request or input from Garzarek or anyone else, (Docket Entry No. 40-3, Fox Deposition at p. 67), based upon Fox's perception that Plaintiff lacked good judgment and had poor interpersonal skills. Id. at pp. 32-42. In Fox's view, Plaintiff needed to develop management, judgment and interpersonal skills as the Captain of a station without being in the spotlight as Captain of Station 2, a high activity and volume station. Id. at p. 67.

Plaintiff subsequently applied to take the test for placement on the "certification list" for promotion to assistant chief, but on September 6, 2007, Harmon informed Plaintiff that due to his recent discipline and his extended probation, he was ineligible. (Docket Entry No. 29-20, September 6, 2007 Memorandum from Harmon to Plaintiff Brown). On September 11, 2007, the

19

Plaintiff filed his Equal Employment Opportunity Commission ("EEOC") charge. On April 10, 2008, Plaintiff filed this action.

Plaintiff next cites a badge ceremony when a group of African Americans whom Plaintiff viewed as potential plaintiffs were present along with television reporters and cameras. According to Plaintiff, Garzarek expressed concern to Plaintiff that with the media present, the African American firefighters would cause a scandal during the badge ceremony and cite their discrimination claims. (Docket Entry No. 40-1, Brown Deposition at pp. 44-45). Plaintiff responded that he would be willing to speak with the firefighters and diffuse the situation before the TV media became involved, but Garzarek declined his offer. Id.

The Plaintiff next cites that he was no longer permitted to act as shift commander if Fox were absent. Fox would designate one of the six (5 captains and 1 lieutenant) station officers to be the officer in charge or "Acting Shift Commander" in his absence. (Docket Entry No. 29-13, Fox Deposition at pp. 9-10). Neither Garzarek nor Chris Brown, a deputy chief, was involved or discussed such assignments with Fox. Id. at p. 10. Plaintiff admitted that Fox was not motivated to retaliate against him. (Docket Entry No. 29-11, Brown Deposition at pp. 121-122).

Plaintiff contends that the attorney who presided at this administrative appeal was a "ringer" for the City because she investigated a prior complaint against Ferguson, but this attorney actually found for Ferguson and against Harmon, the City's representative. (Docket Entry No. 29-10, Moss Affidavit at ¶¶ 3-4). This attorney was "completely neutral" on hearing Plaintiff's appeal. Id. at ¶ 5. Plaintiff next cites the delay of scheduling his appeal hearing, but this delay is typical for such hearings given the multiple participants. (Docket Entry No. 29-4, Harmon Affidavit at ¶ 10). Plaintiff requested one postponement due to his conflict with the

20

suggested date. Id.

Plaintiff next cites denials of four training opportunities as retaliation with the first in January 2008, but Plaintiff was permitted to attend this training. (Docket Entry No. 29-5, Culberson Affidavit at ¶¶ 4-6). Culberson was unaware of Plaintiff's cited protected activities. The second training in February 2008, Fox decided Plaintiff was ineligible because Plaintiff was not on the promotional list for Assistant Chief. (Docket Entry No. 2-13, Fox Deposition at p. 78). The third training in 2009 was CPR training that Plaintiff attended as a participant. (Docket Entry No. 29-12, Brown Deposition at pp. 58, 179. Glen Johnson and Jeff Elliott, the training officers chose Sean Smith to conduct the training because Smith's qualifications as a CPR instructor and his prior request to train. (Docket Entry Nos. 29-9 & 29-10, Elliott Affidavit at ¶ 5 and Jonson Affidavit at ¶ 6, respectively).

## B. Conclusions of Law

Under Section 704(a) of Title VII, retaliation against an employee for exercising the employee's right under Title VII is itself a discriminatory employment practice.

(a) Discrimination for making charges, testifying, assisting, or participating in enforcement proceedings, or hearing. It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42. U.S.C. § 2000e-3(a) (1984) (emphasis added).

Plaintiff must prove: (1) that Plaintiff engaged in activity protected by Title VII; (2) that Plaintiff's exercise of protected activity was known by the Defendant; (3) that, thereafter, the

21

Defendant took an adverse employment action against Plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action. EEOC v. Avery Dennison Corp., 104 F.3d 858, 860 (6th Cir. 1997); Williams v. Nashville Network, 132 F.3d 1123, 1131 (6th Cir. 1997); Nguyen v. City of Cleveland, 229 F.3d 559, 563 (6th Cir. 2000). "[A] plaintiff does not have to prove the validity of the grievance [he] was allegedly punished for lodging; 'opposition activity is protected when it is based on a mistaken good faith belief that Title VII has been violated.'" Robbins, 186 F.3d at 158 (quoting Love v. RE/MAX of America, Inc., 738 F.2d 383, 385 (10th Cir. 1984).

"To establish the causal connection required in the fourth prong, a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not filed a discrimination action." Nguyen, 229 F.3d at 563. "A causal link can be shown by either of two methods: (1) through direct evidence; or (2) through knowledge coupled with a closeness in time that creates an inference of causation... However, temporal proximity alone will not support an inference of retaliatory discrimination when there is no other compelling evidence." Id. (citation omitted).

"[A]lthough no one factor is dispositive in establishing a causal connection evidence that the adverse action that was taken shortly after the Plaintiff's exercise of protected rights is relevant to causation. Id. at 567 ("evidence of temporal proximity alone would be sufficient to support" an inference of a causal link). Temporal proximity between the protected activity and the adverse employment action can give rise to an inference of retaliation. Nguyen, 229 F.3d at 563. See e.g., DiCarlo v. Potter, 358 F.3d 408 (6th Cir. 2004) (recommendation to terminate an employee thirteen (13) days after filing his EEOC charge was sufficient evidence of a causal

22

connection and inference of retaliatory motive).

"[A]t the prima facie stage the burden is minimal, requiring the plaintiff to put forth some evidence to deduce a causal connection between the retaliatory action and the protected activity and requiring the court to draw reasonable inferences from that evidence, providing it is credible." Nguyen, 229 F.3d at 566 (citing EEOC v. Avery Dennison Corp., 104 F.3d at 861). "[A] court may not consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the prima facie case." Grace v. USCAR, 521 F.3d 655, 677 (6th Cir. 2008) (citing Wexler v. White's Fine Furniture, 317 F.3d 564, 574 (6th Cir. 2003)). Here, the Defendants do not dispute the first and second elements of Plaintiff's prima facie case.

Once the Plaintiff has met his burden in establishing a prima facie case of retaliation, the Defendant must provide a legitimate, non-discriminatory reasons for the adverse employment action. Barnett v. Department of Veterans Affairs, 153 F.3d 338 (6th Cir. 1998). If the Defendant is able to show legitimate, nondiscriminatory reasons for the adverse employment action, the burden of persuasion returns to the Plaintiff to demonstrate that the reasons offered by the Defendant were pretextual. Id. Here, the City cites Plaintiff's poor job performance and failure to follow the City's written policy on reporting complaints of harassment and discrimination.

Here, Plaintiff's testimony establishes that he maintained a "neutral" stance on the African American firefighters' racial discrimination claims and in fact, did not discern any racial discrimination or harassment or encourage the African American firefighters to file a legal action. Plaintiff concedes that in his opinion, Ferguson's initial complaint that triggered these

23

events, did not involve any racial discrimination. To be sure, in his deposition in a racial discrimination action, Plaintiff described the Fire Department's use of the "good ole boy system" in awarding promotions. (Docket Entry No. 40-2, Brown Deposition at pp. 40-41). Yet, the Defendant's discipline of Plaintiff was for failing to report Ferguson's statements based upon a preexisting City rule for complaints of harassment. It is undisputed that Ferguson's complaint to Plaintiff involved harassment that the City's policy required to be reported to Garzarek. Garzarek's view of Plaintiff's poor judgment was shared by Fox, Plaintiff's supervisor, whom Plaintiff concedes lacks any retaliatory motive. Plaintiff's other cited conduct by the City officials does not establish actionable conduct, but even is so construed, the proof is that those acts were justified by legitimate reasons that are not shown to be pretextual.

Plaintiff contends in its motion to supplement that a legitimate reason offered by the Defendant, namely that Plaintiff failed to report the complaints of harassment to a Department Head or Human Resources, is pretextual because Garzarek disciplined another African American firefighter for not reporting complaints of harassment "through the chain of command or to take them to the Human Resources Division[.]" (Docket Entry No. 48-1, Jones Disciplinary Hearing, at p. 3).

This supplemental information fails to alter the Court's analysis. First, the stated City policy is to report complaints of harassment to a Department Head or Human Resources, and Plaintiff failed to take either of those routes here. Mike Jones, the subject of Plaintiff's supplement, also failed to take either possible action in that instance, thus leading to his discipline. In short, despite any difference in nomenclature between "Department Head" or "chain of command", both men failed to follow the stated policy and were disciplined for that

24

failure. Finally, the new evidence does not change the fundamental lack of any retaliatory motive on the part of Fox, or impugn the stated reason for the Defendant's actions, namely that in Defendant's view, Plaintiff exhibited poor judgment.

As to Plaintiff's First Amendment claim under 42 U.S.C. § 1983, Plaintiff must: (1) establish that his speech addressed a matter of public concern; (2) "as a citizen" his comment on such matters outweighs the City's interest in preventing such speech; and (3) Plaintiff's speech was a substantial or motivating factor in adverse employment action. See Rogers v. Banks, 344 F.3d 587, 597 (6th Cir. 2003) (citations omitted). Section 1983 liability may attach to a municipality for the single act of a municipal employee. Meyers v. City of Cincinnati, 14 F.3d 1115, 1120 (6th Cir. 1994). A municipality may also be liable if the final policymaker ratifies the unconstitutional action of its subordinate. City of St. Louis v. Praproinik, 485 U.S. 112, 127 (1988); see also Arendale v. City of Memphis, 519 F.3d 587 (6th Cir. 2008) ("In other words, even if the allegedly unconstitutional decision is initially made by a subordinate official, when that decision is appealed to and affirmed by an official with final authority over a matter, the municipality may be held liable for this affirmance.").

For the reasons stated on Plaintiff's Title VII claim, the Court also concludes that Plaintiff's proof cannot support a judgment on his First Amendment claim, as his speech was not the motivating factor for any adverse employment actions.

Without a viable federal claim, the Court lacks jurisdiction to decide Plaintiff's state law claims, and they are dismissed without prejudice. Wal-Juice Bar, Inc. v. Aleut, 899 F.2d 1502, 1504 (6th Cir. 1990).

Accordingly, Defendant's motion for summary judgment should be granted in part as to

25

Plaintiff's federal law claims.

An appropriate Order is filed herewith.

**ENTERED** this the _____ day of January, 2010.

WILLIAM J. HAYNES, JR.
United States District Judge